## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF IDAHO

**PAYSERVICES BANK,**

    Plaintiff,

vs.

**FEDERAL RESERVE BANK OF**
**SAN FRANCISCO,**

    Defendant.

_____ /

## COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

Plaintiff, PAYSERVICES BANK ("PayServices"), in the above-captioned matter, files this Complaint against the Federal Reserve Bank of San Francisco ("FRBSF" or "the Bank") for the denial of an application for a Master Account and alleges as follows:

## INTRODUCTION

1.    This case involves FRSBF's unlawful denial of an application for a master account. PayServices Bank is entitled to obtain the account as an eligible depository institution under federal law. Without such an account, PayServices cannot directly access the Federal Reserve and cannot provide transaction-related services for a variety of customers, including importers and exporters, that other banks with master accounts at the Federal Reserve presently provide. Without a master account, PayServices Bank is relegated to depending on an intermediary bank, which prevents it from managing

the settlement of transactions and services related to foreign trade that it has uniquely positioned itself to handle.

## PARTIES

2.     Plaintiff, PayServices, is a private banking corporation incorporated under the Idaho Bank Act, at Title 26 of Idaho Code.

3.     On August 3, 2022, the Idaho Department of Finance granted "preliminary approval" of PayServices' application to establish a state-chartered bank in Idaho.

4.     PayServices is a "depository institution" within the meaning of the Federal Reserve Act. It is a "bank which is eligible to make application to become an insured bank," 12 U.S.C. § 461(b)(1)(A)(i), as it will be "engaged in the business of receiving deposits," 12 U.S.C. § 1815(a)(1).

5.     Defendant FRBSF is a private corporation created pursuant to an Act of Congress. It is subject to regulation pursuant to certain federal statutes, including but not limited to the Federal Reserve Act and the Deregulation and Monetary Control Act of 1980, as well as regulations issued under the authority of those statutes.

6.     In addition, the Bank conducts certain of its activities pursuant to delegated responsibilities from the Board of Governors of the Federal Reserve System.

7.     The Bank's delegated responsibilities includes the approval of applications for and the issuance of Master Accounts.

## JURISDICTION AND VENUE

8.      This Court has subject matter jurisdiction over this action under 12 U.S.C. § 632, which provides that "all suits of a civil nature at common law or in equity to which any Federal Reserve bank shall be a party shall be deemed to arise under the laws of the United States, and the district courts of the United States shall have original jurisdiction of all such suits."

9.      Pursuant to 28 U.S.C. § 1331, jurisdiction is proper in this Court as it is founded on the existence of a federal question.

10.      Plaintiff also seeks a remedy under the Declaratory Judgments Act, 28 U.S.C. §§ 2201 et seq. This Court has the authority to grant such relief.

11.      Defendant FRBSF is the sole branch of the Federal Reserve, the Central Bank of the United States, that serves the State of Idaho.

12.      Pursuant to 28 U.S.C. §§ 1391(b)(1), venue is proper in this Court because the Plaintiff, PAYSERVICES BANK, is incorporated under the laws of the State of Idaho pursuant to a permit issued by the Idaho Department of Finance. The Bank reside in this District for purposes of 28 U.S.C. § 1391(c)(2). The Bank is an entity with the capacity to be sued. It is subject to this Court's personal jurisdiction because they have purposefully availed themselves of the privileges of conducting business in this District, the claims herein arose in this District, many material witnesses are located in this District, and the Bank is subject to this Court's jurisdiction under Idaho's long-arm statute, Idaho Code § 5-514(a).

13.     In addition, venue is proper under 28 U.S.C. § 1391(b)(2) because a substantial part of the events giving rise to this matter occurred in this district.

14.     Venue is also proper under 28 U.S.C. § 1391(e) because PayServices Bank resides in this district and a substantial part of the events or omissions giving rise to its claims occurred here.

15.     An actual controversy exists between the parties concerning the legality of FRBSF's denial of PayServices' master account application. The controversy is justiciable. PayServices is already suffering injury in account of FRBSF's denial of PayServices' master account application.

## FACTS

16.     On April 22, 2022, PayServices held a meeting with officials from the Federal Deposit Insurance Corporation ("FDIC") and the Federal Reserve Bank of San Francisco ("FRBSF"). The meeting lasted close to two hours. Notably, the following individuals were present at the meeting:

    i.   Wallace Young, Vice President of Credit Risk Management at FRBSF,

    ii.  David Xu, Senior Manager at FRBSF, and

    iii. Debra Rhodes, Senior Financial Institution Examiner at FDIC.

17.     At the meeting, Debra Rhodes, representing the FDIC, concluded that PayServices' business model did not warrant the need to carry FDIC insurance coverage of deposits because PayServices' business model does not involve any type of credit product such as loans, mortgages, or investments.

18.    At the meeting, the officials concluded that the likelihood of a bank failure at PayServices is not possible because, at PayServices, all deposits are available at all times because 100% of deposits are kept in reserve. As a result, there would never be a run on the bank or pose a risk of failure to due to a bank run for the FRBSF.

19.    At the meeting, David Xu, representing the FRBSF, concluded that PayServices' business model is no different than an ATM card (either you have the money in your account, or you don't) and for this reason, the only requirement – from an operational risk assessment – for the FRBSF – is that when a PayServices accountholder shows a balance of $0.00, no overdraft will be allowed. PayServices does not allow accountholders to incur an overdraft. Therefore, this matter is settled.

20.    At the meeting, Wallace Young, the most senior person representing the FRBSF, concluded that should PayServices present a preliminary approval from a state chartering authority within its district, that PayServices will be eligible to apply to request approval of a Master Account for PayServices to be connected to the U.S. payment system and that the FRBSF would be in a position to approve the request for a Master Account based on the business plan and business model that PayServices presented.

21.    On July 28, 2022, the Idaho Department of Finance ("IDF" or the "Department") held a meeting with PayServices. IDF communicated to PAYSERVICES that their entire application, procedures and risk management framework was the most sophisticated they had seen to date. IDF proceeded to

communicate the conditions under which it was willing to issue a preliminary approval. Notably, those conditions included the requirement to meet all federal regulations and be subject to a yearly examination by the Department instead of one every 18 months as is normally the practice. PayServices deemed the conditions reasonable and accepted them.

22.     On August 3, 2022, the IDF issued a preliminary approval for PayServices to establish a banking corporation in the State of Idaho based on the business plan and business model that was presented to the FRBSF at the April 22nd meeting.

23.     On August 10, 2022, PayServices held a meeting with Thomas Doerr, FRBSF Senior Manager, Supervision & Credit, Credit Risk Management and formally requested a master account in accordance with the discussions from the April 22nd meeting.

24.     On August 16, 2022, FRBSF timely received a package of follow up documents that it had requested from PayServices for the processing of the request.

25.     On September 12, 2022, FRBSF timely received proof of PayServices' registration with the Idaho Secretary of State as a banking corporation, which the FRBSF had requested in order to process the request to issue the Master Account.

26.     Between August 10, 2022 and May 31, 2023, PayServices has repeatedly reached out to the FRBSF and has repeatedly inquired as to the status of its approval request for a Fed Master Account. The FRBSF has repeatedly replied that "*the review continues*" and that they are "*not sharing our process with you.*"

27.     All financial institutions must develop a risk management and compliance framework commensurate with their business plan and business model that conforms to the Bank Secrecy Act.

28.     PayServices developed a very comprehensive "Compliance Management System" to adhere to the provisions of, and comply with, the Bank Secrecy Act.

29.     PayServices complies with the Bank Secrecy Act.

30.     Any financial institution wishing to become licensed under the laws of any of the 50 states, must have its compliance framework reviewed and approved by a state chartering authority.

31.     PayServices submitted its compliance framework to the Department of Finance of Idaho. State law requires compliance with all Federal Regulations. The State deemed PayServices' compliance framework as totally acceptable and compliant with both state and federal regulations.

32.     FRBSF, as the Federal Banking Agency responsible for the Supervision of state-member banks, has the power to request a financial institution under its supervision to improve its Compliance framework.

33.     However, the FRBSF was not granted the authority by Congress to deny an application. Congress, through the Federal Reserve Act, allows the FRBSF to engage in limited activities on its behalf. The issuance of a charter is not one of them. The approval of a compliance and/or risk management framework is not part of its

delegated authorities either. The FRBSF's limited authority in this regard allows it to make recommendations.

34.     PayServices, on numerous occasions, asked the FRBSF if they deemed necessary to make any amendment to its Compliance Manage System framework, and if so, to identify which areas required improvements.

35.     FRBSF was **<u>never</u>** able to identify any area of PayServices' extremely comprehensive Compliance and Risk Management framework that would possibly require any improvement.

36.     FRBSF's denial letter states that due to PayServices' intention to focus on one market segment – the commerce of commodities – it considers PayServices' activities as an "unproven risk management framework" and as such is not able to grant a master account.

37.     This is a clear act of discrimination. FRBSF has had 9.5 months to notify PayServices of any deficiencies in its framework; but identified none.

38.     PayServices met and exceeds the requirements to qualify for a master account approval at the FRBSF.

39.     On almost every conversation that PayServices held with the FRBSF during the 9.5 months period, PayServices asked the FRBSF:

> i.   Do you need any additional information?
>
>> 1.  The FRBSF's response was "No."
>
> ii.  Do you see anything that is of concern with the application?

        1.  The FRBSF's response was "No."

    iii.  Do you foresee that any part of the procedures and policies for Bank

        Secrecy Act purposes need to be amended?

        1.  The FRBSF's response was "No."

    iv.  PayServices is amenable to have an "examiner in residence."[1] Will the

        FRBSF want to establish one?

        1.  The FRBSF's response was "No, it won't be necessary."

    v.  Will you notify us if any of the above changes so that we can remedy?

        1.  The FRBSF's response was "Yes."

  b.  The FRBSF repeatedly agreed to work with PayServices to overcome any

    issue, should there be one that arises.

40.    On May 17, 2023, one of PayServices' founders, a resident of Florida, requested the formal assistance of the office of U.S. Senator Marco Rubio (R-FL) in obtaining information regarding the excessive 9.5 months delay in processing the request.

41.    On May 18, 2023, Senator Rubio's office reached out to the Federal Reserve Board asking for the FRBSF to act on PayServices' approval request.

---

[1] An "examiner in residence" is a financial examiner that is employed by the Federal Reserve who goes to work every day at a designated financial institution to monitor bank operations as they happen. Examiners in residence are typically automatically mandated by law with institutions with assets in excess of $10 billion but they can also be designated with smaller institutions. In an abundance of precaution and to preempt any concerns about the soundness of the institution, PayServices offered one.

42.     That same day, a few hours after this little bit of political pressure was generated by the inquiry from Senator Rubio's office, Wallace Young from the FRBSF sent an email to PayServices to notify them that they are "wrapping everything up" and to expect an answer within two weeks.

43.     On May 31, 2023, Wallace Young issued a one-page letter to PayServices to notify them that due to its line of business which focuses almost exclusively on facilitating the trade of commodities through import and export of products from and to the United States, that it was unable to grant PayServices' request because this line of business is a "novel business model" that is "unproven" and thus presents an "undue risk" to the Reserve Bank.

A. **Background on PayServices' Business Model**

44.     PayServices' business model focuses almost exclusively on facilitating trade of commodities for the small to medium enterprises from and to the United States.

45.     Every bank licensed to operate in the United States is able in one capacity or another to facilitate the transmission of funds for the purposes of inter-state and inter-country commerce. Some focus more on retail customers (such as private deposits or local businesses), whereas others on wholesale customers (multi-national companies, foreign governments, etc.).

46.     The only differences between PayServices and other banks engaging in the same transactions are:

i.   PayServices operates no physical branches. This is permitted both under State and Federal law. PayServices, because it is not a lender, does not focus its business on retail customers, and focuses almost exclusively on trade of commodities which transit through any lawful ports of entry and exit, has no need to operate a physical branch.

ii.  PayServices, because it is not a lender of moneys, and is not permitted (through its state permit) to invest customers' deposits, is not required to, and does not, carry FDIC insurance coverage of the deposits. This is permitted both under State and Federal law. Both the FDIC, the FRBSF and the IDF agreed that PayServices' model did not warrant the need for FDIC insurance coverage.

iii. Because PayServices is not a lender, it is required to keep 100% of deposits in reserve. This practice safeguards the security of the customers' deposits and the Federal Reserve System in case of a bank run where every depositor would get its money immediately without the need to tap into any emergency fund. This is permitted both under State and Federal law.

iv.  PayServices' model is not "novel" in any shape or form, it is simply more focused and limited than other banks that offer additional financial products and services.

47.     PayServices' model is not that of a lender. PayServices brings a platform that eliminates the heighten risks and losses that traditional banks suffer as a result of malpractice in global commerce. Where a traditional bank enables the transmission of monies for commerce-related transactions without any verification of the actual merchandise and without good data about the parties, PayServices is able to do the same by linking the actual transaction to a physical verification of the merchandise by the customs agencies of both the United States and the equivalent agency of the receiving country.

48.     PayServices will only release the funds allocated for the transaction once it has received confirmation from the authorities that the transaction complies with applicable law and presents no danger to the public. This technological capability goes above and beyond the Bank Secrecy Act requirements and ensures more secure transactions with less friction and with more reliable trading partners. PayServices' model focuses almost exclusively on one area, but does it extremely well.

49.     PayServices was founded by a small group of people with decades of banking, finance and trade commerce expertise both locally and internationally. PayServices' Chief Financial Officer for the Bank - an important role for the soundness of any financial institution - is both a licensed Certified Bank Examiner and Certified Public Accountant with close to forty years in bank supervision, auditing, treasury management, and financial reporting.

### B. <u>Notable Bank With A Similar Business Model</u>

50.     FRBSF's claim that PayServices' business model is "novel" and "unproven" is belied by the existence of other banks who operate in the same space and a very large bank that provides a similar set of services.

51.     Since 1934, Exim Bank, a federally operated <u>uninsured</u> bank, has focused exclusively on financing and guaranteeing import and export transactions with U.S. based and foreign companies, including in many developing countries with difficult trading and regulatory environments.

52.     In 2021, the U.S. trade to GDP ratio was 25.48% of its economy. Import and export trade and commerce represents one quarter of the U.S. economy.

53.     To take a local example, Idaho's potatoes industry alone represents 15% of the state's GDP.

54.     On May 11, 2023, Idaho's entire congressional delegation – Senators Jim Risch and Mike Crapo and Representatives Mike Simpson and Russ Fulcher – sent a letter along with thirty-one other U.S. House and Senate members to the U.S. Department of Agriculture, urging the USDA to push Japanese officials to buy fresh potatoes.

55.     In other words, the trade of commodities with international merchants and friendly countries to the United States is at the core of the policy of the U.S. government. International commerce strengthens the U.S. economy and foreign relations.

56.     The Executive Office of the President has a program through which they are currently spending $13 billion in grants and financing to foreign nations and developing countries that want to improve their bilateral relations with the U.S. and its companies.

57.     PayServices' initiative to facilitate the entrance in the global economy of small to medium enterprises in the agriculture has been well received by all stakeholders because bigger financial institutions have disregarded this segment of the market to focus on more "lucrative" (in their view) lines of business in the financial marketplace.

58.     FRBSF alleges that PayServices presents an "undue risk" to its reputation. As of May 3, 2023, the Federal Reserve had roughly $8.5 trillion U.S. dollars of assets on its balance sheet. PayServices' business plan projects to have about $1 billion dollars by the third year. To put things into perspective, based on today's numbers (appropriately assuming that the Federal Reserve's balance is most likely to keep growing) PayServices, after 3 years of operations, would represent 0.011% of the entire balance sheet of the Federal Reserve. The miniscule amount of transactions that PayServices will handle, compared to the Federal Reserve's operations, refutes the claim of "undue risk" that FRBSF has put forward to justify denying PayServices a master account.

59.     PayServices does not engage in any speculative activity. PayServices focuses on the most secure transactions that involve a physical verification of

merchandises by government officials that are either United States personnel or personnel of ally and friendly countries of the United States.

**C.** **The Application Denial Is Inconsistent with State-Federal Partnership in Banking Regulation**

60.     The FRBSF's denial of PayServices' application for a master account runs afoul of the system of dual chartering and state-level banking regulation and raises serious federalism concerns.

61.     The United States operates a dual banking system, under which banks may be chartered by a state or the federal government. The dual chartering system divides regulatory responsibility about state and federal authorities stands as an excellent example of federalism.

62.     Under the current dual chartering system, national banks are chartered and primarily regulated by the OCC, while banks with state charters are principally overseen by the state's banking regulatory authority. State-chartered banks may choose to become members of the Federal Reserve System, but are not required to do. A state bank that joins the Federal Reserve System is known as a "state member bank." Those that do not are known as "nonmember banks." State-chartered nonmember banks are regulated by the state banking agency and may also be regulated by the Federal Deposit Insurance Corporation ("FDIC").

63.     While most states require state-chartered banks to obtain FDIC insurance, several states do not require FDIC insurance in part because they recognize that various

types of banking business models do not warrant the issuance of deposit insurance, particularly where the business model does not involve loans, credit, or mortgages. Idaho is one of several states that allows but does not require a state-chartered bank to obtain FDIC insurance. *See* Idaho Code § 26-217.

64.     Nonetheless, PayServices has agreed to comply with all FDIC regulations applicable to its business model. IDF shall enforce and oversee compliance under its regulatory authority. IDF's preliminary approval issued to PayServices Bank provides in relevant part that "PayServices must adhere to all federal regulations applicable to FDIC-insured financial institutions, unless the Director [of the Idaho Department of Finance] explicitly waives this requirement for specific regulations that are not consistent with PayServices' business model."

## D. Federal Law Requires the Issuance of Master Accounts to Eligible Depository Institutions

65.     In 1980, Congress passed the Depository Institutions Deregulation and Monetary Control Act ("MCA"), which mandates that nonmember depository institutions like PayServices Bank be allowed to access Federal Reserve System bank services, regardless of whether the institution chooses to become a member of the Federal Reserve and regardless of whether the institution is insured by the FDIC.

66.     The MCA was a watershed moment which provided that the Federal Reserve could not discriminate against state-chartered depository institutions in the provision of Federal Reserve bank services. *See* 12 U.S.C. § 248(c)(2). The MCA follows

the tradition of dual chartering and the state-federal partnership upon which the U.S. banking regulatory system is premised.

67.     The end of discrimination against state-chartered depository institutions is also consistent with opening up access to banking services for the broader public. PayServices' model also permits unbanked populations in underserved areas of the country to establish a banking relationship.

68.     It is estimated by the Federal Reserve that 63 million people in the United States are either unbanked or underbanked[2], meaning that they either have no bank account or very limited access to one. This is the result of "banking deserts" in parts of the country where no bank has a branch and of a practice known as "redlining."[3]

69.     In furtherance of these principles, the MCA mandated that "[a]ll Federal Reserve bank services covered by the fee schedule *shall be available to nonmember depository institutions . . . .*" 12 U.S.C. § 248a(c)(2) (emphasis added). The services subject to the fee schedule include among others "check clearing and collection services," "currency and coin services," and "wire transfer services" – all of which require a master account.

---

[2] Fed. Res. Sys. Bd. of Governors, *Report on the Economic Well-Being of U.S. Households in 2018 - May 2019* (May 2019), https://www.federalreserve.gov/publications/2019-economic-well-being-of-us-households-in-2018-banking-and-credit.htm; Emily Guy Birken, *The Costs of Being Unbanked or Underbanked*, Forbes (updated Dec. 2, 2022, 10:31 am), https://www.forbes.com/advisor/banking/costs-of-being-unbanked-or-underbanked/.

[3] *See, e.g.*, Candace Jackson, *What Is Redlining?*, N.Y. Times (Aug. 17, 2021), https://www.nytimes.com/2021/08/17/realestate/what-is-redlining.html ("The term [redlining] has come to mean racial discrimination of any kind in housing, but it comes from government maps that outlined areas where Black residents lived and were therefore deemed risky investments."); *see also* Richard Rothstein, THE COLOR OF LAW: A FORGOTTEN HISTORY OF HOW OUR GOVERNMENT SEGREGATED AMERICA (2017)

70.     Without a master account, PayServices, a nonmember depository institution, cannot access Federal Reserve services. Such deprivation prevents PayServices from operating as designed and is inconsistent with the exercise of regulatory authority by the Idaho Department of Finance.

71.     The power to deny a master account to a bank chartered by the State of Idaho would have the effect of rendering the state's power to issue charters for the establishment of banks meaningless.

72.     There are currently about a dozen banks chartered under the Idaho Bank Act – the same act under which PayServices received its permit. All of them have a master account at the FRBSF. PayServices Bank should be treated no differently.

## COUNT I
## Violation of APA, 5 U.S.C. § 706(2)
## Claim for Unlawful Denial of Master Account Application Against FRBSF

73.     Plaintiff repeats and realleges the allegations set forth in paragraphs 1 through 72 as if fully set forth herein.

74.     The federal Administrative Procedures Act ("APA") provides in relevant part that "[t]o the extent necessary to decision and when presented, the reviewing court shall decide all relevant questions of law, interpret constitutional and statutory provisions, and determine the meaning or applicability of the terms of an agency action. The reviewing court shall . . . hold unlawful and set aside agency action, findings, and conclusions found to be . . . arbitrary, capricious, an abuse of discretion, or otherwise

not in accordance with law" or "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right[.]" 5 U.S.C. § 706(2)(A) & (C).

75.     The APA defines an agency, with certain exceptions not applicable here, as "each authority of the Government of the United States, whether or not it is within or subject to review by another agency." 5 U.S.C. § 551(1); 5 U.S.C. § 701(b)(1).

76.     The affairs of the FRBSF are conducted under the close supervision and ultimate control of the Federal Reserve System Board of Governors, an independent federal regulatory agency.

77.     The Board is authorized "[t]o examine at its discretion the accounts, books, and affairs of each Federal reserve bank . . . and to require such statements and reports as it may deem necessary," 12 U.S.C. § 248(a), "[t]o suspend or remove any officer or director of any Federal reserve bank," *id.* § 248(f), "[t]o suspend, for the violation of any of the provisions of [the Act], the operations of any Federal reserve bank, to take possession thereof, administer the same during the period of suspension, and, when deemed advisable, to liquidate or reorganize such bank," *id.* § 248(h), and "[t]o exercise general supervision over [the] Federal reserve banks," *id.* § 248(j).

78.     Indeed, in August 2022, the Board issued "Guidelines Covering Access to Accounts and Services at Federal Reserve Banks (Account Access Guidelines)" – the very Guidelines upon which FRBSF based its denial of PayServices' master account application - citing its general supervisory authority under Section 248(j). Fed. Res. Sys.

Bd. of Governors, *Guidelines for Evaluating Account and Services Requests*, 87 Fed. Reg. 51099, 51106 (Aug. 19, 2022).

79.    The Board's Rules of Procedure, 12 C.F.R. § 262 (1981), indicate that many applications for the approval of action by the Board are to be filed with and acted upon pursuant to delegated authority by a Federal Reserve Bank.

80.    The Board has delegated substantial decision-making authority to the Federal Reserve Banks. Thus, FRBSF possesses substantial independent authority in the exercise of specific functions and has authority in law to make decisions. As such, FRBSF may be considered an "agency" within the meaning of the APA.

81.    As an agency, the FRBSF has a non-discretionary duty to make available Federal Reserve bank services through master accounts to nonmember depository institutions under the MCA. 12 U.S.C. § 248a(c)(2).

82.    It is undisputed that PayServices Bank is eligible to maintain a master account in the form of a state-chartered depository institution.

83.    FRBSF never presented any specific barriers to approval prior to the issuance of a denial and recognized that the application was properly filed.

84.    In light of the facts alleged herein, FRBSF's "agency action" in denying PayServices' master account application is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A).

85.    In the denial of PayServices' request for a master account approval, FRBSF relied upon the guidelines that it adopted from the Federal Reserve Board.

86.     Those guidelines have not been approved by Congress.

87.     The guidelines adopted by the FRBSF are identical to discriminatory redlining maps that categorize areas based on color. Instead of colors, the FRBSF makes use of "tiers". Where redlining maps have 3 colors: blue, yellow and red; the FRBSF has 3 tiers: Tier 1, Tier 2, and Tier 3.

| Unlawful Redlining maps | Guidelines Congress did not approve |
|---|---|
| Best | Tier 1 |
| Tolerable | Tier 2 |
| Not desirable | Tier 3 |

88.     FRBSF, by qualifying PayServices has a Tier 3 financial institution, has discriminated against PayServices by putting it in the basket of those that are not desirable because PayServices do not conform to the criteria of preference of the FRBSF; but the law is clear: there is no room for emotions or preferences. The law must be equal to all and applied equally to all. Congress created one law – the Federal Reserve Act – and that is the only law of the land that regulates the FRBSF.

89.     Furthermore, FRBSF's "agency action" lacks statutory authority under 5 U.S.C. § 706(2)(C) to the extent Section 248a(c)(2) requires that "all Federal Reserve bank services . . . **shall** be available to nonmember depository institutions" (emphasis added) and the use of those services requires a master account.

WHEREFORE, Plaintiff respectfully requests that the Court:

a.  Order a speedy hearing on this action, thereby advancing this action on the Court's calendar;

b.  Grant declaratory relief, declaring that PayServices has a right, as an eligible depository institution, to have a master account and to use that master account to access Federal Reserve bank services in a non-discriminatory manner;

c.  Grant Plaintiff all monetary damages permissible under law;

d.  Grant Plaintiff costs, fees, and other expenses under the Equal Access to Justice Act, 28 U.S.C. § 2412; and

e.  Grant any other and further relief that the Court deems just and proper.

## COUNT II
## Relief Under the Mandamus Act, 28 U.S.C. § 1361
## Claim for Mandamus Against FRBSF

90.   Plaintiff repeats and realleges the allegations set forth in paragraphs 1 through 72 as if fully set forth herein.

91.   Under 28 U.S.C. § 1361, "[t]he district courts shall have original jurisdiction of any action in the nature of mandamus to compel an officer or employee of the United States or any agency thereof to perform a duty owed to the plaintiff."

92.   In this action, PayServices is seeking a writ of mandamus to the FRBSF directing that it promptly rescind the denial of PayServices' master account application and instead grant the application so that PayServices can access Federal Reserve bank services.

93.   This Court has jurisdiction over PayServices' action under the Mandamus Act.

94.   The FRBSF's President is an "officer[] . . . of the United States" and is subject to the Court's mandamus power.

95.   Mandamus is appropriate here because PayServices has a clear and certain claim to have its master account application granted. Under the MCA, Federal Reserve banking services "*shall* be available" on a non-discriminatory basis to eligible depository institutions. 12 U.S.C. § 248a(c)(2) (emphasis added).

96.   Despite PayServices' valid Idaho bank charter approval and its conceded eligibility, FRBSF still denied PayServices' master account application.

97.   Mandamus is necessary in this case because FRBSF has left PayServices with no other adequate remedies. It denied PayServices' master account application on May 31, 2023, and PayServices has no other method by which it can access Federal Reserve services.

98.   Without a master account, PayServices will incur unnecessary costs, encounter otherwise avoidable risks (such as risks involving the settlement of transactions by relying on an intermediary bank), and will lose ground to competitors that already have a master account. Ultimately, PayServices cannot complete its banking operations or operate as designed without a master account.

WHEREFORE, Plaintiff respectfully requests that the Court:

a.  Order a speedy hearing on this action, thereby advancing this action on the Court's calendar;

b.  Enter an order compelling the FRBSF to rescind the denial of PayServices' master account application and instead grant the application;

c.  Grant Plaintiff all monetary damages permissible under law;

d.  Grant Plaintiff costs, fees, and other expenses under the Equal Access to Justice Act, 28 U.S.C. § 2412; and

e.  Grant any other and further relief that the Court deems just and proper.

## COUNT III
### Violation of Due Process Clause of the Fifth Amendment
### Claim for Relief Against FRBSF

99.    Plaintiff repeats and realleges the allegations set forth in paragraphs 1 through 72 as if fully set forth herein.

100.    FRBSF has violated PayServices' right to procedural and substantive due process under the Fifth Amendment to the U.S. Constitution

101.    FRBSF has deprived PayServices of a protectible property interest – namely, access to a Federal Reserve master account.

102.    PayServices has a legitimate claim of entitlement to the benefit, not an abstract need or a unilateral expectation.

103.    As noted above, Section 248a requires the issuance of master accounts to eligible depository institutions. Consequently, PayServices has a legitimate property interest in a master account.

WHEREFORE, Plaintiff respectfully requests that this Court:

a.  Order a speedy hearing on this action, thereby advancing this action on the Court's calendar;

b.  Declare that PayServices has a right, as an eligible depository institution, to have a master account and to use that master account to access Federal Reserve bank services in a non-discriminatory manner;

c.  Enter an order compelling the FRBSF to rescind the denial of PayServices' master account application and instead grant the application.

d.  Grant Plaintiff all monetary damages permissible under law;

e.  Grant Plaintiff costs, fees, and other expenses under the Equal Access to Justice Act, 28 U.S.C. § 2412; and

f.  Grant any other and further relief that the Court deems just and proper.

## <u>JURY DEMAND</u>

Plaintiff demands a jury on all issues so triable.

**Dated:** June 23, 2023

*Respectfully submitted,*

*/s/ Asa D. Brown, Esq.*

Asa D. Brown Esq.
Managing Attorney
The Law Offices of Asa D. Brown, PLLC
315 N. Monroe St.
Moscow, Idaho 83843
asa@asabrownlaw.com
(904) 477-7900 (cell)
ID Bar # 11990

25