# UNITED STATES DISTRICT COURT
## DISTRICT OF IDAHO

| | |
|---|---|
| PAYSERVICES BANK, | Case No.: 1:23-cv-00305-REP |
| Plaintiff, | **MEMORANDUM DECISION AND ORDER RE:** |
| vs. | |
| FEDERAL RESERVE BANK OF SAN FRANCISCO, | **DEFENDANT FEDERAL RESERVE BANK OF SAN FRANCISCO'S MOTION TO DISMISS PLAINTIFF'S COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF (Dkt. 22)** |
| Defendant. | |
| | **DEFENDANT FEDERAL RESERVE BANK OF SAN FRANCISCO'S MOTION TO STRIKE THE DECLARATION OF LIONEL DANENBERG (Dkt. 26)** |
| | **DEFENDANT FEDERAL RESERVE BANK OF SAN FRANCISCO'S MOTION FOR LEAVE TO FILE A NOTICE OF SUPPLEMENTAL AUTHORITY (Dkt. 34)** |

This matter comes before the court on Defendant Federal Reserve Bank of San Francisco's ("FRBSF") Motion to Dismiss Plaintiff's Complaint for Declaratory and Injunctive Relief (Dkt. 22). FRBSF also files a related Motion to Strike the Declaration of Lionel Danenberg (Dkt. 26) and a related Motion for Leave to File a Notice of Supplemental Authority (Dkt. 34). Because Plaintiff PayServices Bank ("PayServices") has not stated a claim upon which relief can be granted, FRBSF's Motion to Dismiss is granted. FRBSF's Motion to Strike and Motion for Leave to File a Notice of Supplemental Authority are also granted. The rulings are more particularly explained in the following Memorandum Decision and Order.

**MEMORANDUM DECISION AND ORDER - 1**

# I.  BACKGROUND

This case concerns PayServices' claim to a "master account" and how FRBSF denied PayServices' application for one.  For context, the Court includes a brief discussion about the Federal Reserve System generally, as well as master accounts, before examining PayServices' specific allegations and claims against FRBSF.

## A.    The Federal Reserve System

The Federal Reserve Act ("FRA") established the Federal Reserve System in 1913.  12 U.S.C. § 221 *et seq.*  Though the Federal Reserve System operates as the central bank of the United States, there is no single central bank.  Rather, the Federal Reserve System is a composite of several public and private entities: (i) the Federal Reserve Board of Governors ("Board of Governors"); (ii) the 12 regional Federal Reserve Banks, including FRBSF; and (iii) the Federal Open Market Committee ("FOMC"), the body that sets national monetary policy.  *Id* at § 222. These entities, through the Federal Reserve System, promote the health of the United States economy and the stability of its financial system.  *See Am. Bankers Ass'n v. United States*, 932 F.3d 1375, 1378 (Fed. Cir. 2019) ("The [FRA] of 1913 established a system to oversee banking operations and promote greater economic stability.") (internal citations omitted); *see also The Fed Explained: What the Central Bank Does* at 1 (11th ed. 2021) (hereinafter "*The Fed Explained*") (discussing the Federal Reserve System's five general functions to "promote the effective operation of the United States economy and, more generally, the public interest").[1]

As the name suggests, the Board of Governors is the central governing body of the Federal Reserve System.  *McKinley v. Bd. of Governors of the Fed. Rsrv. Sys.*, 647 F.3d 331, 333

---

[1]  *Available at* https://www.federalreserve.gov/aboutthefed/files/the-fed-explained.pdf. The Court takes judicial notice of these materials.  *See Lee v. City of Los Angeles*, 250 F.3d 668, 689 (9th Cir. 2001) ("A court may take judicial notice of 'matters of public record' without converting a motion to dismiss into a motion for summary judgment.").

**MEMORANDUM DECISION AND ORDER - 2**

(D.C. Cir. 2011) (the Board of Governors "is the central supervisory authority of the Federal Reserve System.").  Located in Washington, D.C., it is an agency of the federal government that reports to and is directly accountable to Congress, and whose seven members ("governors") are nominated by the President of the United States and confirmed by the United States Senate.  12 U.S.C. §§ 241, 248; *see also The Fed Explained* at 2.  As the governing body of the Federal Reserve System, the Board of Governors oversees the decentralized operations of Federal Reserve Banks.  12 U.S.C. § 248(a)(1); *see also The Fed Explained* at 8.

But Federal Reserve Banks are themselves "'private corporations whose stock is owned by the member commercial banks within their districts.'"  *McKinley*, 647 F.3d at 333 (quoting *Comm. for Monetary Reform v. Bd. of Governors of Fed. Rsrv. Sys.*, 766 F.2d 538, 540 (D.C. Cir. 1985)); *see also Lewis v. United States*, 680 F.2d 1239, 1241 (9th Cir. 1982) ("Each Federal Reserve Bank is a separate corporation owned by commercial banks in the region."); 12 U.S.C. § 341 (Federal Reserve Banks are "a body corporate").  Federal Reserve Banks are each controlled by their own nine-member board of directors,[2] charged with carrying out typical bank functions, including "collecting and clearing checks, making advances to private and commercial entities, holding reserves for member banks, discounting the notes of member banks, and buying and selling securities on the open market."  *Lewis*, 680 F.2d at 1241 (citing 12 U.S.C. §§ 341-361); *see also* 12 U.S.C. § 301.  As the Federal Reserve System's "operating arms," Federal Reserve Banks operate as bankers' banks to much of the banking industry:

> In its role providing key financial services, the Reserve Bank acts, essentially, as a financial institution for the banks, thrifts, and credit unions in its District – that is, each Reserve Bank acts as a "bank for banks."  In that capacity, it offers (and charges for) services to these depository institutions similar to those that ordinary banks provide their individual and business customers: the equivalent of checking

---

[2]  The commercial banks that hold stock in their District's Federal Reserve Bank elect six of the directors, while the three remaining directors are appointed by the Board of Governors. *The Fed Explained* at 4; *see also* 12 U.S.C. §§ 302, 304-305.

**MEMORANDUM DECISION AND ORDER - 3**

accounts; loans; coin and currency; safekeeping services; and payment services
(such as the processing of checks and the making of recurring and nonrecurring
small- and large-dollar payments) that help banks, and ultimately their customers,
buy and sell goods, services, and securities.

*The Fed Explained* at 8, 11.

Highlighting the coordinated and symbiotic relationship between the Federal Reserve

System's distinct parts, Federal Reserve Banks serve as the clearinghouse for information about

the businesses and needs of local communities in their respective regions.  *Id*. at 5, 8, 11.  That

information is then factored into monetary policy decisions by the FOMC[3] and other decisions

made by the Board of Governors.  *Id*.

**B.       Master Accounts**

A master account is a deposit account that permits a depository institution to make

deposits into and withdrawals from an account held and administered by its regional Federal

Reserve Bank.  It is, "put simply, a bank account for banks" that "gives depository institutions

access to the Federal Reserve System's services, including its electronic payments system."

*Fourth Corner Credit Union v. Fed. Rsrv. Bank of Kansas City*, 861 F.3d 1052, 1053 (10th Cir.

2017) (Moritz, J.).  As the Board of Governors more fully explains:

> The master account is both a record of financial transactions that reflects the
> financial rights and obligations of an account holder and the Reserve Bank with
> respect to each other, and the place where opening and closing balances are
> determined.  For each institution, all credits and debits resulting from the use of
> Federal Reserve services at any Federal Reserve office are booked to this single
> master account at one Reserve Bank.

*Id*. at 1064, n.1 (Bacharach, J.) (citation omitted).  "Without such access, a depository institution

is nothing more than a vault."  *Id*. at 1053 (Moritz, J.) (internal quotation marks omitted).

---

[3]  The FOMC consists of 12 voting members: (i) the seven members of the Board of
Governors; (ii) the president of the Federal Reserve Bank of New York; and (iii) four of the
remaining 11 Reserve Bank presidents, who serve one-year terms on a rotating basis.  *The Fed
Explained* at 8, 12.

**MEMORANDUM DECISION AND ORDER - 4**

In 1980, Congress passed the Depository Institutions Deregulation and Monetary Control Act of 1980 ("MCA").  Pub. L. No. 96-221.  Up until that time, deposit accounts with Federal Reserve Banks were limited to the United States Government and Federal Reserve "member" banks.  The MCA changed that.  It amended the FRA to allow *nonmember* depository institutions access to Federal Reserve Bank services.  *See* 12 U.S.C. § 342 (adding "other depository institutions" to the list of entities from which Federal Reserve Banks "may receive" deposits); *see also* Compl. at ¶ 65 (Dkt. 1).  The MCA also gave depository institutions equal access to the same pricing for Federal Reserve Bank services.  *See* 12 U.S.C. § 248a(c)(2); *see also* Compl. at ¶¶ 66, 69 (Dkt. 1) (citing 12 U.S.C. § 248(a)(c)(2)).

Then, on August 19, 2022, in response to the rapidly-evolving payments landscape and uptick in novel charter types, the Board of Governors adopted "Guidelines for Evaluating Account and Services Requests" ("Guidelines") to provide guidance to Federal Reserve Banks. 87 Fed. Reg. 51,099 (Aug. 19, 2022); *see also* Compl. at ¶ 78 (Dkt. 1).  Section 1 of the Guidelines adopted six principles[4] that Federal Reserve Banks are to use when evaluating requests for master accounts and access to Federal Reserve Bank services.  87 Fed. Reg. at 51,106.  Section 2 of the Guidelines set forth a tiered review framework to "serve as a guide to

---

[4]  The Guidelines are predicated on the following six principles: (i) "Each institution requesting an account or services must be eligible under the Federal Reserve Act or other federal statute to maintain an account at a Reserve Bank and receive Federal Reserve services and should have a well-founded, clear, transparent, and enforceable legal basis for its operations"; (ii) "[p]rovision of an account and services to an institution should not present or create undue credit, operational, settlement, cyber, or other risks to the Reserve Bank"; (iii) "[p]rovision of an account and services to an institution should not present or create undue credit, liquidity, operational, settlement, cyber, or other risks to the overall payment system"; (iv) "[p]rovision of an account and services to an institution should not create undue risk to the stability of the U.S. financial system"; (v) "[p]rovision of an account and services to an institution should not create undue risk to the overall economy by facilitating activities such as money laundering, terrorism financing, fraud, cybercrimes, or other illicit activity"; and (vi) "[p]rovision of an account and services to an institution should not adversely affect the Federal Reserve's ability to implement monetary policy."  87 Fed. Reg. at 51,099.

**MEMORANDUM DECISION AND ORDER - 5**

the level of due diligence and scrutiny" that Federal Reserve Banks are to apply to requests from different types of institutions. *Id*. at § 51,109. The three tiers are: (i) "Tier 1: Eligible institutions that are federally insured"; (ii) "Tier 2: Eligible institutions that are not federally insured but are subject (by statute) to prudential supervision by a federal banking agency"; and (iii) "Tier 3: Eligible institutions that are not federally insured and are not considered in Tier 2." *Id*. at 51,109-10. "Although institutions in a higher tier will on average face greater due diligence and scrutiny than institutions in a lower tier," Federal Reserve Banks maintain the "authority to grant or deny an access request by an institution in any of the three proposed tiers . . . on a case-by case, risk-focused bases." *Id*. at 51,109; *see also id*. at 51,110 (after discussing characteristics of Tier 3 institutions: "Accordingly, Tier 3 institutions will generally receive the strictest level of review"). Ultimately, the Guidelines are "designed to provide additional transparency into the expected review process based on key characteristics." *Id*. at § 51,109; *see also id*. at § 51,106 ("These Account Access Guidelines also serve to inform requestors of the factors that a Reserve Bank will review in any access request and thereby allow a requestor to make any enhancements to its risk management, documentation, or other practices to attempt to demonstrate how it meets each of the principles.").

## C.    PayServices, Its Request for a Master Account, and This Action

PayServices is a private Idaho depository institution that "focuses almost exclusively on facilitating trade commodities for the small to medium enterprises from and to the United States." Compl. at ¶¶ 2-4, 44, 46(i) (Dkt. 1). It is not a lender, but instead provides payment processing to foreign merchants, buyers, and governments "by linking the actual transaction to a physical verification of the merchandise by the customs agencies of both the United States and the equivalent agency of the receiving country." *Id*. at ¶¶ 46(i)-(ii), 47. "PayServices will only release the funds allocated for the transaction once it has received confirmation from the

**MEMORANDUM DECISION AND ORDER - 6**

authorities that the transaction complies with applicable law and presents no danger to the public." *Id*. at ¶ 48. According to PayServices, its model "focuses almost exclusively on one area, but does it extremely well." *Id*.

Given its business model, PayServices needs a master account. So, on August 10, 2022, one week after it secured preliminary approval from the Idaho Department of Finance to establish a state-chartered bank in Idaho, PayServices applied to FRBSF to obtain one. *Id*. at ¶¶ 3, 23. PayServices contends that, without a master account, it "cannot directly access the Federal Reserve and cannot provide transaction-related services for a variety of customers, including importers and exporters, that other banks with master accounts at the Federal Reserve presently provide." *Id*. at ¶¶ 1, 70, 72. Likewise, without a master account, PayServices claims that it would be "relegated to depending on an intermediary bank, which prevents it from managing the settlement of transactions and services related to foreign trade that it has uniquely positioned itself to handle." *Id*. at ¶¶ 1, 98. In short, PayServices' success depends on having a master account.

On May 31, 2023, FRBSF denied PayServices' request for a master account. *Id*. at ¶ 43 FRBSF's two-page denial letter reasoned:

> FRBSF is unable to grant your request because the request does not meet the standards outlined in the Board of Governors' Guidelines for Evaluating Account and Service Requests (Guidelines). PayServices has obtained "preliminary approval" from the Idaho Department of Finance to establish an uninsured Idaho state-chartered bank and would not be subject to prudential supervision by a federal banking agency. PayServices intends to operate exclusively as an online bank and to focus its business model almost entirely on providing payment processing solutions to foreign import and export merchants and buyers, and foreign governments. Under the Guidelines, PayServices is a Tier 3 institution and thus subject to the strictest level of review. The proposed, novel, monoline business model and focus on transactions that are largely foreign in nature or involve mostly foreign participants presents undue risk.
>
> PayServices Bank's unproven risk management framework is considered insufficient to address the heightened risks associated with its novel, monoline

**MEMORANDUM DECISION AND ORDER - 7**

business model, including its ability to mitigate money laundering and terrorism financing risks. Most notably, the significant risks and concerns in the areas of [Bank Secrecy Act]/[Anti-Money Laundering] and [Office of Foreign Assets Control] risk management, credit and settlement process and controls, cyber and information security risk management, enterprise risk management, strategic planning, and the limited banking and bank-specific risk management experience among management, presents undue risk to the Reserve Bank. The proposal also presents potential concerns with respect to PayServices' ability to be resolved safely and effectively upon failure, due to its uninsured status. Should the institution allow the Master Account to fund or facilitate illicit activity, undue reputational risk may also be posed to the Reserve Bank, Payment and/or U.S. financial system.

Ex. A to Karp Decl. (Dkt. 22-2).

PayServices disagrees with the justification given for FRBSF's denial of its master account request, and separately posits that it runs contrary to the dual chartering system and state-level banking regulation. *See generally* Compl. at ¶¶ 46-64 (Dkt. 1). This action, however, is much more fundamental than that. PayServices asserts that, because it was eligible to receive a master account in the first instance – as a state-chartered depository institution – FRBSF was *required* as a matter of law to issue it a master account. *Id*. at 16 ("Federal law requires the issuance of master accounts to eligible depository institutions."); *see also id*. at ¶¶ 1, 69, 81, 89, 92, 95, 101-103. PayServices in turn brings three interrelated claims against FRBSF under (i) the Administrative Procedures Act ("APA"); (ii) the Mandamus Act; and (iii) the Due Process Clause of the Fifth Amendment. *Id*. at ¶¶ 73-103. These claims seek the same relief: a court order requiring FRBSF to grant PayServices a master account.

FRBSF now moves to dismiss PayServices' Complaint, arguing that (i) each claim must be dismissed because FRBSF had discretion to deny PayServices' request for a master account; (ii) each claim must alternatively be dismissed because FRBSF is not an agency of the federal government; (iii) the APA claim itself must alternatively be dismissed because FRBSF's decision to deny PayServices a master account was not arbitrary or capricious; and (iv) the Due

**MEMORANDUM DECISION AND ORDER - 8**

Process claim itself must alternatively be dismissed because PayServices has not alleged that it was denied procedural protections.  *See generally* Mem. ISO MTD (Dkt. 22-1).  On January 25, 2024, the Court heard oral argument on FRBSF's Motion to Dismiss.  For the reasons discussed below, the Court grants that Motion.[5]

## II.  LEGAL STANDARD

Federal Rule of Civil Procedure 12(b)(6) allows a court to dismiss a complaint for "failure to state a claim upon which relief can be granted."  Fed. R. Civ. P. 12(b)(6).  When evaluating a Rule 12(b)(6) motion, the court accepts as true all well-pleaded factual allegations in the complaint, while disregarding unsupported legal conclusions.  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).  Next, having identified the adequately-pleaded facts, the court "determine[s] whether they plausibly give rise to an entitlement to relief."  *Id*. at 679.  Stated concisely, "[t]o survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face."  *Id*. at 678.

## III.  DISCUSSION

**A.    Each of PayServices' Claims Must Be Dismissed Because FRBSF Had Discretion to Deny PayServices Request for a Master Account**

The FRA does not provide a private right of action.  Still, PayServices pursues one against FRBSF via the APA (5 U.S.C. § 706(2)), the Mandamus Act (28 U.S.C. § 1361), and the Due Process Clause of the Fifth Amendment.  The success of each of these claims depends on the existence of a nondiscretionary duty to make a master account available to PayServices through which it can access Federal Reserve Bank services.  *See* 5 U.S.C. § 701(a)(2) (the APA

---

[5]  Alongside its underlying Motion to Dismiss, FRBSF also (i) moves to strike the Declaration of Lionel Danenberg (submitted in support of PayServices' opposition to FRBSF's Motion to Dismiss) (Dkt. 26); and (ii) moves for leave to file a notice of supplemental authority (Dkt. 34).  Though not emphasized herein, these motions are resolved within the broader context of FRBSF's Motion to Dismiss – which the Court primarily focuses upon.

**MEMORANDUM DECISION AND ORDER - 9**

does not apply when "agency action is committed to agency discretion by law"); *Pittston Coal Grp. v. Sebben*, 488 U.S. 105, 121 (1988) ("The extraordinary remedy of mandamus under 28 U.S.C. § 1361 will issue only to compel the performance of a clear nondiscretionary duty"); *M.H. v. Jeppesen*, 2023 WL 4080542, at *17 (D. Idaho Jun. 20, 2023) ("If government officials have the discretion to grant or deny a benefit, that benefit is not a protected property interest" to support a Due Process claim) (citing *Ching v. Mayorkas*, 725 F.3d 1149, 1155 (9th Cir. 2013)). PayServices alleges that there is the requisite nondiscretionary duty here because 12 U.S.C. § 248a(c)(2) requires that it be issued a master account.  Compl. at ¶¶ 81, 95, 103 (Dkt. 1) (citing § 248a(c)(2) in support of all three of its claims).  PayServices' entire case therefore rises and falls with whether § 248a(c)(2) requires that FRBSF issue it a master account.

FRBSF responds that it does not.  Indeed, it argues that § 248a(c)(2) is "irrelevant" because it neither entitles PayServices to a master account nor imposes any duties on Federal Reserve Banks relating to master accounts.  Mem. ISO MTD at 9 (Dkt. 22-1).  According to FRBSF, § 248a(c)(2) only instructs the Board of Governors – not Federal Reserve Banks – to guarantee that the Federal Reserve System does not price discriminate between member and nonmember banks.  *Id*.  Instead, FRBSF argues that 12 U.S.C. § 342 provides Federal Reserve Banks with discretion to grant or deny master accounts.  *Id*. at 8-9.  Given this discretion, says FRBSF, PayServices' claims against it cannot stand.  *Id*. at 6-15.

These dueling positions frame a lynchpin issue before the Court: must Federal Reserve Banks grant master accounts to an otherwise eligible depository institution regardless of its risk profile?  The Court agrees with FRBSF that they do not.

    1.    <u>12 U.S.C. § 342</u>

The Court's analysis begins with § 342 – a section that, since its enactment in 1913, appears in Subchapter IX of Chapter 3 of Title 12 of the United States Code.  Subchapter IX is

notably titled: "Powers and Duties of *Federal Reserve Banks*." (Emphasis added).  Consistent

with this direction to Federal Reserve Banks, § 342 specifically states that a Federal Reserve

Bank "*may* receive from any of its member banks, or other depository institutions, . . . deposits

of current funds in lawful money, national-bank notes, Federal reserve notes, [etc.]"  12 U.S.C.

§ 342 (emphasis added).  The United States Supreme Court has confirmed that this language

does not "impose[ ] upon reserve banks any obligation to receive" deposits, but "merely confers

authority to do so."  *Farmers & Merchs. Bank v. Fed. Rsrv. Bank of Richmond*, 262 U.S. 649,

662 (1923) (rejecting an argument similar to PayServices' that "the Federal Reserve Bank of

Richmond is obliged to receive for collection any check upon any North Carolina state bank");

*see also Biden v. Texas*, 597 U.S. 785, 803 (2022) ("The statute says 'may.'  And 'may' does not

just suggest discretion, it *clearly* connotes it.") (internal quotation marks omitted) (emphasis in

original).  The Supreme Court further observed that the discretionary and nondiscretionary

aspects of the FRA were no accident, stating: "[t]his statute appears to have been drawn with

great care.  Throughout the act the distinction is clearly made between what the board and the

Reserve Banks 'shall' do and what they 'may' do."  *Farmers & Merchs.*, 262 U.S. at 663.

    The Federal Reserve Banks' discretionary deposit-taking function continued through the

enactment of the MCA in 1980.  At that time, Congress amended § 342 to authorize Federal

Reserve Banks to open deposit accounts to both member banks *and* nonmember depository

institutions.  *Supra*.  Importantly, however, the MCA did not disturb § 342's "may receive"

language that *Farmers & Merchants* construed as giving Federal Reserve Banks the discretion to

receive deposits.  Congress can therefore be presumed to have "accepted and ratified" this same

position within the MCA.  *See Texas Dep't of Hous. & Cmty. Affairs v. Inclusive Communities

Project*, 576 U.S. 519, 536 (2015) (Congress' decision to amend the Fair Housing Act while still

adhering to the operative language within particular sections "is convincing support for the

conclusion that Congress accepted and ratified the unanimous holdings of the Courts of Appeals

finding disparate-impact liability."); *see also Forest Grove School Dist. v. T.A.*, 557 U.S. 230,

243, n.11 (2009) ("When Congress amended IDEA without altering § 1415(i)(2)(C)(iii), it

implicitly adopted [the Supreme Court's] construction of [that same] statute.").  Thus, § 342

gives Federal Reserve Banks the discretion to receive or reject deposits from an institution.

        Given the role of master accounts within the Federal Reserve System, this discretion

necessarily means that Federal Reserve Banks similarly have the discretion to grant or deny

account access.  *See Banco San Juan Internacional, Inc. v. Fed. Rsrv. Bank of New York*, 2023

WL 7111182, at *7 (S.D.N.Y. Oct. 27, 2023) ("BSJI's statutory claim fails because 12 U.S.C.

§ 342 makes clear that *Federal reserve banks are authorized to maintain Master Accounts, but

are not required to do so*.") (emphasis added);[6] *see also Custodia Bank, Inc. v. Fed. Rsrv. Board

of Governors*, 640 F. Supp. 3d 1169, 1183 (D. Wyo. Nov. 11, 2022) (noting that the argument

that "the discretion to receive or reject deposits necessarily carries with [it] the discretion to grant

or deny master accounts[,] . . . presents as logical[.]").[7]  This parallel discretion is not just

commonsensical; it aligns with the Federal Reserve System's charge to provide a safe, flexible,

---

        [6] FRBSF asks that the Court consider this supplemental authority (entered after the
completion of briefing on FRBSF's Motion to Dismiss) on the issue of PayServices' ability to
bring the same claims asserted here, and under similar circumstances (albeit presented in the
context of a motion for preliminary injunction, not a motion to dismiss).  Mot. for Leave to File
Not. of Supp. Authority (Dkt. 34).  The Court grants the Motion and recognizes this recent
authority as adding to the evolving state of the law on the issues presented within FRBSF's
Motion to Dismiss, particularly given the absence of Ninth Circuit case law in this same area.

        [7] In *Custodia Bank*, U.S. District Judge Scott Skavdahl denied a similar motion to
dismiss made by a defendant Federal Reserve Bank.  *Custodia Bank*, 640 F. Supp. 3d at 1185.
He cited (i) an opinion out of the Tenth Circuit (which includes the District of Wyoming),
*Fourth Corner Credit Union v. Fed. Rsrv. Bank of Kansas City*, 861 F.3d 1052 (10th Cir. 2017);
and (ii) the need to more fully develop the record in light of the plaintiff's allegations against the
Board of Governors.  *Id.*  But *Custodia Bank* does not compel a similar result here because, for
the reasons stated herein, *Fourth Corner* does not apply and is distinguishable (*infra*), and there
is not a similar need to develop the record based upon PayServices' allegations.

**MEMORANDUM DECISION AND ORDER - 12**

and stable financial system. *Supra.* To be sure, the Federal Reserve System expressly permits as much.

For example, the August 2022 Board of Governors' Guidelines repeatedly underscore that Federal Reserve Banks have the absolute discretion to grant or deny master account requests:

> The Board intended for the Original Proposal to support consistency in evaluating account access requests across Reserve Banks, *while maintaining the discretion granted to the Reserve banks under the Federal Reserve Act to grant or deny access requests.*
>
> . . . .
>
> *Reserve Banks also retain the discretion to deny a request for access to accounts and services where, in the Reserve Bank's assessment, granting access to the institution would pose risks that cannot be sufficiently mitigated.*
>
> . . . .
>
> The Board also added language in the final Account Access Guidelines that clarifies the respective roles of the Board (Reserve Board oversight) *and the Reserve Banks (discretion in decision making)* with respect to evaluating access requests.
>
> . . . .
>
> The Board believes it is important *to make clear that legal eligibility does not bestow a right to obtain an account and services. While decisions regarding individual access requests remain at the discretion of the individual Reserve Banks*, the Board believes it is important that the Reserve Banks apply a consistent set of guidelines when reviewing such access requests to promote consistency across Reserve Banks and to facilitate equitable treatment across institutions.
>
> . . . .
>
> These guidelines broadly outline considerations for evaluating access requests *but are not intended to provide assurance that any specific institution will be granted an account and services. The individual Reserve Bank will evaluate each access request on a case-by-case basis.* When applying these account access guidelines, the Reserve Bank should factor, to the extent possible, the assessments of an institution by state and/or federal supervisors into *its independent analysis* of the institution's risk profile. The evaluation of an institution's access request should

also consider whether the request has the potential to set a precedent that could affect the Federal Reserve's ability to achieve its policy goals now or in the future.

87 Fed. Reg. at 51,100, 102-103, 106 (emphasis added).[8]

Moreover, in December 2022, Congress amended the FRA to require the Board of Governors to "create and maintain a public, online, and searchable database that contains . . . a list of every entity that submits an access request for a reserve bank master account and services . . . including whether, and the dates on which a request was submitted; and was approved, *rejected*, pending, or withdrawn."  12 U.S.C. § 248c(b)(1)(B) (emphasis added).  Though the reasons for rejecting a master account request may vary, this section acknowledges that master accounts do not automatically follow a request for one, as PayServices suggests is the case.  *See Banco San Juan*, 2023 WL 7111182, at *7 (holding that § 248c(b)(1)(B) "confirms that Federal reserve banks may 'reject' [master account] applications from depository institutions").

Finally, "Operating Circulars" exist to establish the terms by which a depository institution may request to open, maintain, and terminate a master account with the Federal Reserve Bank in its district.  *See, e.g.*, Federal Reserve Banks *Operating Circular No. 1 (Account Relationships)* at ¶ 1.0 (Sept. 1, 2023) (hereinafter "OC-1").[9]  Particularly relevant here, OC-1 states that a Federal Reserve Bank "has discretion in deciding whether to provide a Financial Institution with access to a Master Account and may require a Financial Institution to provide additional information and documentation to the Reserve Bank to support its decision making."  *Id*. at ¶ 2.6.

---

[8]  Deference to the Board's interpretation of the FRA – the statute it is tasked with administering – is appropriate.  *See Int'l Bd. of Teamsters, Local 2785 v. Fed. Motor Carrier Safety Admin.,* 986 F.3d 841, 849 (9th Cir. 2021).

[9]  *Available at* http://www.frbservices.org/binaries/content/assets/crsocms/resources/rules-regulations/090123-operating-circular-1.pdf.  The Court takes judicial notice of these materials.  *See supra* (citing *Lee*, 250 F.3d at 689).

**MEMORANDUM DECISION AND ORDER - 14**

Taken together, by virtue of these pronouncements, the Board of Governors, Congress, and Federal Reserve Banks variously contemplate that the FRA affords Federal Reserve Banks the discretion to grant or deny master accounts to depository institutions.  PayServices cites precious little congressional or agency interpretation of § 342 to the contrary.

    2.    <u>12 U.S.C. § 248a(c)(2)</u>

In response, PayServices counters that § 342 does not address master account access, but rather presupposes that a depository institution already has a master account, and that Federal Reserve Banks only have discretion with respect to the types of monetary instruments that it may receive for deposit or collection (from master account holders).  Opp. to MTD at 7 (Dkt. 23).  PayServices then argues that another section from the MCA – § 248a(c)(2) – actually applies to compel Federal Reserve Banks to issue master accounts when eligible depository institutions request one.  *Id*. at 7-8 (citing *Fourth Corner*, 861 F.3d at 1074 (Bacharach, J.) ("Section 342 addresses the types of monetary instruments that Federal Reserve Banks may receive for deposit or collection . . . .  But Section 342 does not address which institutions can access Federal Reserve services; that subject is governed instead by Section 248a(c)(2), which enables open access to Federal Reserve services for all nonmember depository institutions.  As a result, Section 342 does not affect Fourth Corner's entitlement to a master account.")).  The Court disagrees that either § 248a(c)(2) or *Fourth Corner* applies to require that FRBSF issue PayServices a master account.

In pertinent part, § 248a provides:

Pricing of services

(a)    **Publication of pricing principles and proposed schedule of fees; effective date of schedule of fees**

    [T]he Board shall publish for public comment a set of pricing principles in accordance with this section and a proposed schedule of fees based upon

**MEMORANDUM DECISION AND ORDER - 15**

those principles for Federal Reserve bank services to depository institutions, and . . . the Board shall begin to put into effect a schedule of fees for such services which is based on those principles.

. . . .

(c)    **Criteria applicable**

The schedule of fees prescribed pursuant to this section shall be based on the following principles:

(1)    All Federal Reserve bank services covered by the fee schedule shall be priced explicitly.

(2)    All Federal Reserve bank services covered by the fee schedule shall be available to nonmember depository institutions and such services shall be priced at the same fee schedule applicable to member banks, except that nonmembers shall be subject to any other terms, including a requirement of balances sufficient for clearing purposes, that the board may determine are applicable to member banks.

(3)    Over the long run, fees shall be established on the basis of all direct and indirect costs actually incurred . . . .

(4)    Interest on items credited prior to collection shall be charged at the current rate applicable in the market for Federal funds.

12 U.S.C. § 248a (emphasis in original).

Most obviously problematic to PayServices' claim is that § 248a(c)(2) appears in Subchapter II of Chapter 3 of Title 12 of the United States Code. Subchapter II is notably entitled: "*Board of Governors* of the Federal Reserve System." So, unlike § 342, which specifically applies to Federal Reserve Banks (*supra*), § 248a(c)(2) applies only to the Board of Governors. *See INS v. Nat'l Ctr. for Immigrants' Rights, Inc.*, 502 U.S. 183, 189 (1991) ("[T]he title of a statute or section can aid in resolving an ambiguity in the legislation's text."). Except the Board of Governors does not issue master accounts, Federal Reserve Banks do. *Supra*; *see also*, *e.g.*, Compl. at ¶¶ 23, 36 (PayServices alleging that it applied to FRBSF for a master account and that FRBSF denied its application for a master account). On this point, the Court

**MEMORANDUM DECISION AND ORDER - 16**

agrees with FRBSF that "[i]t would be anomalous for Congress to hide a requirement that Reserve Banks must grant direct master accounts to all depository institutions, irrespective of risk presented, in a provision that is not even addressed to the Reserve Banks."  Mem. ISO MTD at 10 (Dkt. 22-1) (citing *Whitman v. Am. Trucking Ass'ns*, 531 U.S. 457, 468 (2001) ("Congress, we have held, does not alter the fundamental details of a regulatory scheme in vague terms or ancillary provisions – it does not, one might say, *hide elephants in mouseholes*.") (emphasis added)); *see also Banco San Juan*, 2023 WL 7111182, at *8 ("If Congress intended to require Federal reserve banks to provide specific services, the direction would reasonably have been found in the section dealing with the duties and powers of Federal reserve banks and not in the section dealing with fee schedules set by the Board.").

Section 248a's language does nothing to resolve this tension in a way that supports PayServices' argument.  Just the opposite, with § 248a's title indicating upfront that it speaks to the "[p]ricing of services," before unsurprisingly describing how the Board of Governors is tasked with "publish[ing] . . . pricing principles . . . and a proposed schedule of fees based upon those principles for Federal Reserve bank services to depository institutions."  12 U.S.C. § 248a(a).  As to the referenced "schedule of fees," § 248a(c) then directs that (i) "[a]ll Federal Reserve bank services covered by the fee schedule shall be priced explicitly," and (ii) "[a]ll Federal Reserve bank services covered by the fee schedule shall be available to nonmember depository institutions and such services shall be priced at the same fee schedule applicable to member banks[.]"  *Id*. at §§ 248a(c)(1),(2).  Despite this straightforward guidance on pricing, PayServices maintains that § 248a(c)(2) requires the issuance of a master account because the only way Federal Reserve Bank services are available to nonmember depository institutions in the first place is through a master account.  Opp. to MTD at 8 (Dkt. 23) (citing *Fourth Corner*, 861 F.3d at 1071 (Bacharach, J.)).

**MEMORANDUM DECISION AND ORDER - 17**

There is admittedly a syllogism to PayServices' position when considering § 248a(c)(2) in isolation. But read in context, § 248a(c)(2) does not operate to mandate access to the services covered by any "fee schedule" via a master account. It is more appropriately understood to be an anti-price discrimination provision benefitting nonmember depository institutions: it confirms that a nonmember bank with access to the Federal Reserve System will pay the same for those services as a member bank. *See Banco San Juan*, 2023 WL 7111182, at *7 (rejecting argument that § 248a(c)(2) speaks to, let alone requires, master accounts, stating that it "is best read as a clause preventing price discrimination in favor of banks that are members of the Federal Reserve System" and "the section does not even state that the services covered by the fee schedule shall be available to 'all nonmember depository institutions'"); *see also Jet Courier Servs., Inc. v. Fed. Rsrv. Bank of Atlanta*, 713 F.2d 1221, 1227 (6th Cir. 1983) (explaining that the services offered by Federal Reserve Banks under § 248a "are to be made available to nonmember depository institutions at the same fees charged to member banks"). Therefore, even assuming § 248a(c)(2)'s application to Federal Reserve Banks, nothing therein prevents them from denying a depository institution's request for a master account.

Considering PayServices' wholesale reliance on U.S. Circuit Judge Robert Bacharach's separate opinion in *Fourth Corner*, the above-referenced shortcomings in PayServices' arguments correspondingly extend to that opinion and will not be re-hashed here. But there are additional reasons for distinguishing Judge Bacharach's opinion that are worth highlighting. First, *Fourth Corner* is out-of-circuit authority and therefore not controlling law in this district. Second, even if *Fourth Corner* was controlling, only Judge Bacharach's opinion reached the merits, which was not substantively incorporated into the court's ultimate *per curiam* decision. *See, e.g.*, *Maryland v. Wilson*, 519 U.S. 408, 412-13 (1997) (statements within a concurrence do not "constitute[ ] binding precedent"); *see also Banco San Juan*, 2023 WL 7111182, at *8

**MEMORANDUM DECISION AND ORDER - 18**

("Judge Bacharach's opinion is neither controlling (*even in the Tenth Circuit*), nor persuasive.") (emphasis added).  Third, Judge Bacharach's separate opinion was issued prior to the Board of Governors' August 2022 Guidelines, which squarely contradict his reasoning.  *See Fourth Corner*, 861 F.3d at 1070-71 (Judge Bacharach commenting on the Board of Governors' interpretation of the MCA "before this litigation").  Finally, Judge Bacharach's separate opinion preceded § 248c(b)(1)(B)'s December 2022 enactment.  *See Banco San Juan*, 2023 WL 7111182, at * 8 ("And Judge Bacharach in his 2017 opinion did not have the advantage of Congress's December 23, 2022 statute, that explicitly acknowledged that the Board was required to maintain a database of Master Accounts rejected by Federal reserve banks.") (citing § 248c(b)(1)(B)).

At bottom, § 342 makes clear that Federal Reserve Banks are authorized to accept deposits, and thus open master accounts.  Critically, however, they are not required to do so.  Nothing in § 248a(c)(2) upends this discretion.  Otherwise, Federal Reserve Banks would oddly be forced to open master accounts, without regard to the risks posed to the financial system, yet allow them to reject every deposit into those same master accounts.  Such an interpretation makes little sense.  A better reading of these statutes is that (i) Federal Reserve Banks have discretion to receive deposits by granting a master account under § 342, and that (ii) nonmember master account holders then have access to the services covered by the Board of Governors' fee schedule at the same prices available to member master account holders under § 248a(c)(2).  The predicate discretion under § 342 precludes each of PayServices' claims against FRBSF.

FRBSF's Motion to Dismiss is granted in this respect.

**B.      Each of PayServices' Claims Must Alternatively Be Dismissed Because FRBSF Is Not an Agency of the Federal Government**

The success of PayServices' APA, Mandamus Act, and Due Process claims also depends on whether FRBSF is a federal agency.  *See* 5 U.S.C. § 702 (APA allows judicial review for

**MEMORANDUM DECISION AND ORDER - 19**

persons "suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action"); 28 U.S.C. § 1361 ("The district courts shall have original jurisdiction of any action in the nature of mandamus to compel an officer or employee of the United States or any agency thereof to perform a duty owed to the plaintiff."); *Bingue v. Prunchak*, 512 F.3d 1169, 1174 (9th Cir. 2008) ("The Fifth Amendment's due process clause only applies to the federal government.").  FRBSF and PayServices agree that, to qualify as an agency under these theories, an entity must "exercise substantial independent authority" on behalf of the government or, in other words, be the "center of gravity in the exercise of administrative power."  *See* Mem. ISO MTD at 15 (Dkt. 22-1) (quoting *Dong v. Smithsonian Inst.*, 125 F.3d 877, 881-82 (D.C. Cir. 1997)); Opp. to MTD at 10 (Dkt. 23) (same); *compare with* 5 U.S.C. § 701(b)(1) (APA defines "agency" as an "authority of the Government of the United States.").  They predictably depart, however, on the ultimate question of whether Federal Reserve Banks meet this standard. *Compare* Mem. ISO MTD at 15-18 (Dkt. 22-1), *with* Opp. to MTD at 9-12 (Dkt. 23).

Describing Federal Reserve Banks' role within the Federal Reserve System, PayServices contends that, "as an instrumentality of the federal government," they are inescapably governmental agencies subject to judicial review under the APA.  Opp. to MTD at 9-12 (Dkt. 23); *see also* Compl. at ¶¶ 32, 80, 81 (Dkt. 1).  It is true that Federal Reserve Banks are integral components of the Federal Reserve System, such that it can legitimately be argued that they are federal instrumentalities.  *See United States ex rel. Kraus v. Wells Fargo & Co.*, 943 F.3d 588, 592 (2d. Cir. 2019) (Federal Reserve Banks "are instrumentalities of the federal government and the operating arms of its central bank.").  But this characterization does not *ipso facto* make them government agencies.  This is especially true when "Congress has gone out of its way to formally separate the [Federal Reserve Banks] *from the government*"; "[t]he [Federal Reserve Banks] *are not part of any executive department or agency*"; Federal Reserve Banks *do not*

*"have the authority* to promulgate regulations with the force and effect of law"; and "Congress has considered the status of the [Federal Reserve Banks] on multiple occasions and decided *not* to convert them formally into government agencies."  *Id*. at 597-98.  Indeed, "many financial institutions are . . . considered federal instrumentalities, without attaining the status of government agencies within the meaning of federal procedural rules."  *In re Hoag Ranches*, 846 F.2d 1225, 1227 (9th Cir. 1988) (confronting whether a credit association is a federal agency under Federal Rule of Appellate Procedure 4(a)(1)).

Federal Reserve Banks are more accurately described as private corporations, owned by their member commercial banks.  *Supra* (citing 12 U.S.C. § 341 ("Upon the filing of the organization certificate with the Comptroller of the Currency a Federal reserve bank shall become a body corporate[.]")); *see also, e.g.*, *U.S. Shipping Bd. Emergency Fleet Corp. v. W. Union Tel. Co.*, 275 U.S. 415, 425-26 (1928) ("Instrumentalities like national banks or the federal reserve banks, in which there are private interests, are not departments of the government.  *They are private corporations in which the government has an interest*.") (emphasis added); *Kraus*, 943 F.3d at 597 ("This separation from general government dates to the founding of the Fed in 1913 when Congress, following other major advanced economies, decided to leave governance of money and credit, at least in part, in private hands. . . .  [T]he legislative history of the FRA suggests that Congress intended the [Federal Reserve Banks] to serve the interests of, but stand apart from, the sovereign.") (internal quotation marks omitted) (citing H.R. Rep. No. 69, 63d Cong., 1st Sess., at 18 (1913) (describing the Federal Reserve System's structure as consisting of "a combination of public and private characteristics")).

Additionally, while Federal Reserve Banks operate with policy oversight by the Board of Governors (a recognized agency of the federal government), that does not convert Federal Reserve Banks into government agencies.  To the contrary, their unique statutory authorizations

**MEMORANDUM DECISION AND ORDER - 21**

and control by their own board of directors sets them apart.  *See* 12 U.S.C. § 301 (Federal Reserve Banks' "shall be conducted under the supervision and control of a board of directors" who "shall perform the duties usually appertaining to the office of directors of banking associations[.]"); *id*. at §§ 302, 304-305 (majority of Federal Reserve Banks' board of directors elected not by the Board of Governors, but by commercial banks); *see also Scott v. Fed. Rsrv. Bank of Kansas City*, 406 F.3d 532, 535 (8th Cir. 2005) ("The Bank is a private, independent entity independently run by its own board of directors.  It is not run by the Federal Reserve Board of Governors or any other part of the executive branch.").  A Federal Reserve Bank's authority to issue master accounts, without more, does not upset this distinction.  *See Dong*, 125 F.3d at 881 ("that an organization makes decisions does not always mean that it is a government agency") (internal quotation marks omitted).  It is simply a prescribed function of Federal Reserve Banks within the Federal Reserve System, not a reflection of "substantial independent authority" on behalf of the federal government or the "center of gravity" in the exercise of its administrative power.

For this reason, the Court disagrees with PayServices' argument that Federal Reserve Banks are governmental agencies given that the Board of Governors has delegated to them the authority to grant master accounts.  Opp. to MTD at 10-12 (Dkt. 23) (citing 12 C.F.R. § 265.20; *Lee Constr. Co. v. Fed. Rsrv. Bank of Richmond*, 558 F. Supp. 165 (D. Md. Aug. 6, 1982)); *see also* Compl. at ¶¶ 6, 7, 79, 80 (Dkt. 1).  Significantly, however, the portion of the FRA discussing functions delegated to Federal Reserve Banks makes no reference to deposit accounts. *See* 12 C.F.R. § 265.20.  This is because Federal Reserve Banks already have this authority under § 342 (*supra*); that is, the Board of Governors does not have this authority to delegate away.  *See Banco San Juan*, 2023 WL 7111182, at *9-10 (distinguishing *Lee*, stating: "But unlike in *Lee*, the Board does not determine whether the FRBNY may open or terminate a

Master Account.  Instead, the statute authorizes the FRBNY to use its discretion to make this

decision. . . .  The FRA provides the FRBNY with discretion to open or terminate Master

Accounts.") (citing 12 U.S.C. § 342).

In sum, despite the lack of controlling precent in the Ninth Circuit on the matter, the

Court nonetheless concludes that Federal Reserve Banks are not agencies of the federal

government in this setting.  The recognized principles on this point confirm as much to the

Court's satisfaction, as well as authority within the Ninth Circuit holding that Federal Reserve

Banks are not federal agencies under a different statutory framework.  *See Lewis*, 680 F.2d at

1241 (affirming district court's dismissal for lack of subject matter jurisdiction, stating:

"Examining the organization and function of the Federal Reserve Banks, and applying the

relevant factors, we conclude that the Reserve Banks are not federal instrumentalities for

purposes of the [Federal Tort Claims Act], but are independent, privately owned and locally

controlled corporations.").  In *Lewis*, the Ninth Circuit was persuaded that Federal Reserve

Banks were not federal agencies owing to its historically intentional detachment from the federal

government itself:

> It is evident from the legislative history of the Federal Reserve Act that Congress
> did not intend to give the federal government direction over the daily operations of
> the Reserve Banks:
>
> > It is proposed that the Government shall retain sufficient power over
> > the reserve banks to enable it to exercise a direct authority when
> > necessary to do so, but that it shall in no way attempt to carry on
> > through its own mechanism the routine operations and banking which
> > require detailed knowledge of local and individual credit and which
> > determine the funds of the community in any given instance.  In other
> > words, the reserve-bank plan retains to the Government power over the
> > exercise of the broader banking functions, while it leaves to individuals
> > and privately owned institutions the actual direction of routine.

*Id*. (quoting H.R. Rep. No. 69, 63d Cong., 1st Sess., at 18-19 (1913)); *see also id*. at 1241-43

(discussing distinctness of Federal Reserve Banks).  The Court adopts this same line of reasoning

**MEMORANDUM DECISION AND ORDER - 23**

to find that, on balance, Federal Reserve Banks are not an agency of the federal government for the purposes of PayServices' claims against FRBSF.

FRBSF's Motion to Dismiss is granted in this alternate respect.

**C.     PayServices' APA Claim Must Alternatively Be Dismissed Because FRBSF's Decision to Deny PayServices' Master Account Request Was Not Arbitrary or Capricious**

Under the APA, an agency action must be upheld unless it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."  5 U.S.C. § 706(2)(A).  A decision is arbitrary or capricious "'if the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.'"  *Providence Yakima Med. Ctr. v. Sebelius*, 611 F.3d 1181,1190 (9th Cir. 2010) (quoting *Motor Vehicle Mfrs. Ass'n of the U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983)).  The "touchstone of 'arbitrary [or] capricious' review under the APA is 'reasoned decision-making.'"  *Altera Corp. & Subsidiaries v. Comm'r of Internal Revenue*, 926 F.3d 1061, 1080 (9th Cir. 2019) (quoting *Motor Vehicle Mfrs. Ass'n*, 463 U.S. at 52).  Courts sustain an agency action if the agency has "examine[d] the relevant data and articulate[d] a satisfactory explanation for its action including a 'rational connection between the facts found and the choice made.'"  *Id*. (quoting *Motor Vehicle Mfrs. Ass'n*, 463 U.S. at 43) (internal quotation marks omitted)).  Courts are "highly deferential" to the agency's decision, *Providence Yakima*, 611 F.3d at 1190, and are not to "substitute its judgment for that of the agency."  *J & G Sales Ltd. v. Truscott*, 473 F.3d 1043, 1051 9th Cir. 2007).  "[C]ourts will 'uphold a decision of less than ideal clarity if the agency's path may reasonably be discerned.'"  *Id*. at 1052 (quoting *Motor Vehicle Mfrs. Ass'n*, 463 U.S. at 43).

**MEMORANDUM DECISION AND ORDER - 24**

PayServices alleges that FRBSF's decision to deny its master account request was arbitrary or capricious because FRBSF was required to issue the master account under the FRA. *See* Compl. at ¶¶ 84, 87-88 (Dkt. 1) ("Congress created one law – the Federal Reserve Act – and that is the only law of the land that regulates the FRBSF. . . .  Section 248a(c)(2) requires that 'all Federal Reserve bank services . . . ***shall*** be available to nonmember depository institutions' [ ] and the use of those services requires a master account.") (emphasis in original).  But as already stated, § 342 – not § 248a(c)(2) – applies to master account requests.  *Supra*.  Therefore, to the extent that PayServices' APA-related claim depends on § 248a(c)(2)'s application as a matter of law to requests for master accounts, it necessarily falls short and must be dismissed.

And while PayServices alleges that FRBSF denied its master account request using the Board of Governors' August 2022 Guidelines (Compl. at ¶¶ 78, 85 (Dkt. 1)), it does not plead any facts showing that FRBSF's decision was inconsistent with them.  Absent any allegation that FRBSF failed to follow the Guidelines, there is nothing anchoring PayServices' APA claim.  *See El Rescate Legal Servs., Inc. v. Exec. Office of Immigration Review*, 959 F.2d 742, 753 (9th Cir. 1991) ("There no right to sue for a violation of the APA in the absence of a 'relevant statute' whose violation 'forms the legal basis for [the] complaint.'") (quoting *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 883 (1990)).[10]  PayServices' disagreement with FRBSF's decision (as opposed to the process involved) does not itself make that decision arbitrary or capricious.

FRBSF's Motion to Dismiss is granted in this alternate respect.

---

[10]  PayServices attempts to "add meat to the bone" in this respect by attaching the Declaration of Lionel Danenberg (Dkt. 23-1) as an attachment to its opposition to FRBSF's Motion to Dismiss.  As a general rule, courts "may not consider material beyond the complaint in ruling on a Rule 12(b)(6) motion."  *Intri-Plex Techs., Inc. v. Crest Group, Inc.*, 499 F.3d 1048, 1052 (9th Cir. 2007).  Because the Court finds PayServices' APA claim lacking for multiple reasons, it will grant FRBSF's Motion to Strike (Dkt. 26) rather than accept the Declaration and convert FRBSF's Motion to Dismiss into a motion for summary judgment.

**D.      PayServices' Due Process Claim Must Alternatively Be Dismissed Because There Were No Alleged Denials of Procedural Protections**

PayServices alleges that it has a property interest in a master account and that FRBSF's denial of PayServices' master account request violates its right to procedural and substantive due process under the Fifth Amendment to the U.S. Constitution.  Compl. at ¶¶ 100-103 (Dkt. 1). But PayServices does not have a legitimate claim of entitlement to a master account.  *Supra*. Therefore, PayServices' allegation of a procedural due process violation is without merit.  *See Brewster v. Bd. of Educ. of Lynwood Unified Sch. Dist.*, 149 F.3d 971, 982 (9th Cir. 1998) (Procedural due process claims have two elements: (i) a deprivation of a *protected property interest*; and (ii) a "denial of adequate procedural protections") (emphasis added).

As well, PayServices' claim to a master account is not a fundamental right under the U.S. Constitution.  *See Merrill v. Cnty. of Madera*, 2013 WL 1326542, at *4 (E.D. Cal. Mar. 29, 2013) ("Substantive due process protection is usually reserved for the vindication of fundamental rights, such as marriage, family, procreation, and bodily integrity.") (citing *Albright v. Oliver*, 510 U.S. 266, 272 (1994)).  Therefore, PayServices' substantive due process violation is also without merit.

In any event, FRBSF separately argues that, even if PayServices' claim to a master account *was* a protected property interest, PayServices still has not been denied any procedural protections and that, as a result, its Due Process claim must be dismissed for this alternate reason. Mem. ISO MTD at 20 (Dkt. 22-1) (citing *Pinnacle Armor, Inc. v. United States*, 648 F.3d 708, 717 (9th Cir. 2011) ("The Due Process Clause, however, does not require that the agency grant a formal hearing.  All that is required before a deprivation of a protected interest is notice and opportunity for hearing *appropriate to the nature of the case*.") (internal quotation marks omitted) (emphasis in original)).  To that end, FRBSF notes that PayServices admits that it

**MEMORANDUM DECISION AND ORDER - 26**

received two opportunities to meet with FRBSF, was permitted to submit written evidence, and received a written decision explaining the basis for FRBSF's decision. *Id*. (citing Compl. at ¶¶ 16, 23-25, 43 (Dkt. 1)). According to FRBSF, these protections are enough to satisfy the Due Process Clause. *Id*. On this record, the Court agrees. *See Pinnacle*, 648 F.3d at 717 (dismissing Due Process claim when plaintiff "had ample opportunities to submit evidence both before and after the Notice was revoked" and the state actor "explained its decision . . . even if no formal administrative hearings took place").

FRBSF's Motion to Dismiss is granted in this alternate respect.

## IV.  <u>ORDER</u>

Based on the foregoing, IT IS HEREBY ORDERED that (i) FRBSF's Motion to Dismiss Plaintiff's Complaint for Declaratory and Injunctive Relief (Dkt. 22) is GRANTED; (ii) FRBSF's Motion to Strike the Declaration of Lionel Danenberg (Dkt. 26) is GRANTED; and (iii) FRBSF's Motion for Leave to File a Notice of Supplemental Authority (Dkt. 34) is GRANTED. PayServices' Complaint is dismissed with prejudice.

DATED:  March 30, 2024

_____
Honorable Raymond E. Patricco
Chief U.S. Magistrate Judge